# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

NICHOLAS SCOTT WERLING,

                Plaintiff,

v.

AGENT BOSWELL, JERMAINE
JOHNSON, ANDREW DEAN, ALEX
KAUFMAN, RYAN SCHWARTZ,
JOHN DOE #1, JOHN DOE #2, and
JANE DOE #1,

                Defendants.

Case No. 24-CV-1291-JPS

## ORDER

## 1.      INTRODUCTION

Plaintiff Nicholas Werling ("Werling"), proceeding pro se, sues United States Secret Service Agents Boswell, Johnson, John Doe #1, and John Doe #2 (the "Secret Service Defendants") and Dodge County Sheriff's Deputies Andrew Dean, Alex Kaufman, and Ryan Schwartz (the "Dodge County Defendants"), and Jane Doe #1, an officer of an unidentified county's sheriff's department (all together, "Defendants"),[1] for violating his Fourth Amendment rights. *See* ECF Nos. 7–9 (operative complaint and screening orders). Werling's claims against the Secret Service Defendants rest on the cause of action created in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) (hereinafter "*Bivens*"), while his claims against

---

[1]Counsel for the Secret Service Defendants has not appeared for John Does #1 or #2. However, for ease of reference, the Court includes John Does #1 and #2 in "Secret Service Defendants" when discussing Plaintiff's allegations against this group of Defendants and their arguments for dismissal. No attorney has appeared for Jane Doe #1, but any claim against this Defendant is subject to dismissal for the reasons discussed below.

the Dodge County Defendants are pursuant to 42 U.S.C. § 1983. ECF No. 8 at 6.

The Dodge County Defendants answered the operative complaint, ECF No. 23, as did the Secret Service Defendants, ECF No. 41. The Secret Service Defendants then moved for judgment on the pleadings, seeking dismissal of Werling's claims against them for two reasons: first, that *Bivens* does not provide a remedy for those claims, and second, that the Secret Service Defendants are entitled to qualified immunity. ECF No. 42. The Dodge County Defendants moved to join the Secret Service Defendants' motion as to the qualified immunity argument. ECF No. 47. The motions are fully briefed. ECF No. 43, 50,[2] 51. For the reasons stated herein, the Dodge County Defendants' motion to join the Secret Service Defendants' motion will be granted, and the Secret Service Defendants' motion for judgment on the pleadings will be granted, resulting in a complete dismissal of this case.

## 2.      LEGAL STANDARD

Once the pleadings are closed, a party may file a motion pursuant to Federal Rule of Civil Procedure 12(c) to challenge the sufficiency of the pleadings. "Judgment on the pleadings is appropriate when there are no disputed issues of material fact and it is clear that the moving party . . . is entitled to judgment as a matter of law." *Unite Here Local 1 v. Hyatt Corp.*,

---

[2]On June 24, 2025, Defendants jointly filed a letter notifying the Court that Plaintiff missed the deadline to file a response to the motion for judgment on the pleadings. ECF No. 48 at 1. On June 27, 2025, Plaintiff responded to the jointly filed letter asking for the Court to retroactively extend the deadline for his response, filed that same day, and to consider it in analyzing the motion for judgment on the pleadings. ECF No. 49 at 1; ECF No. 50. The Court finds good cause to retroactively extend Plaintiff's deadline to file his opposition brief, *see* FED. R. CIV. P. 6(b), accepts Plaintiff's opposition brief, and considers it in the below analysis.

862 F.3d 588, 595 (7th Cir. 2017) (citing *Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987)).

A motion for judgment on the pleadings is analyzed under the same standard as motions to dismiss brought pursuant to Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014) (citing *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007)). To state a claim sufficient to withstand a Rule 12(b)(6) motion, the complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (modifications omitted)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is one with "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Twombly*, 550 U.S. at 556.

In evaluating a motion for judgment on the pleadings, the Court considers both the complaint and the answer(s), and as with Rule 12(b)(6) motions to dismiss, may also consider material subject to judicial notice. *Federated Mut. Ins. Co. v. Coyle Mech. Supply, Inc.*, 983 F.3d 307, 312–13 (7th Cir. 2020) (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998); *Vrana v. FedEx Freight, Inc.*, 638 F. Supp. 3d 927, 929 (C.D. Ill. 2022) (citing *Mohamed v. WestCare Ill., Inc.*, 786 F. App'x 60, 61 (7th Cir. 2019)). The Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor

of the plaintiff." *Kubiak*, 810 F.3d at 480–81 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). But the Court "need not accept as true 'legal conclusion[s, or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Ultimately, dismissal is only appropriate "if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to the relief requested." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (quoting *R.J.R Servs., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)).

**3.      RELEVANT FACTS**

Around 7:00 a.m. on October 6, 2024, Werling was driving to a political rally in Dodge County for then-presidential candidate Donald Trump, when a Dodge County Sheriff's Deputy started following Werling's vehicle. ECF No. 8 at 2, 5 (complaint). Werling arrived in the town of Juneau; he eventually could not drive any further because the road was blocked. *Id.* at 2. While Werling was stopped at the roadblock, law enforcement (he does not identify which officer(s) or jurisdiction(s)) approached him and told him to pull over. *Id.* at 2, 4. He complied by pulling into a parking lot. *Id.* At this point, it was about 7:21 a.m. *Id.* at 5.

Andrew Dean, a deputy for the Dodge County Sheriff's Office ("Dodge County Sheriff's Deputy Dean" or "Dean"),[3] was among the law enforcement officers who spoke to Werling when he pulled over into the parking lot. Dean "told [Werling] that he is on the FBI's domestic terrorism

---

[3]For ease of understanding, the Court will sometimes refer to Defendants by their law enforcement affiliations, e.g., "Dodge County Sheriff's Deputy Dean," "Secret Service Agent Boswell," etc.

watchlist," "said that the Secret Service wanted to speak with [him]," and took away Werling's keys. *Id.* at 4, 5. The Secret Service Defendants aver that Werling was indeed on such a watchlist on the date in question, ECF No. 41 at 5, though it is unclear how Defendants knew or believed that he was on a domestic terrorism watchlist. Werling appears not to dispute that he was included on this list. *See* ECF No. 50 at 4–5.[4]

Two agents of the United States Secret Service—Agent Boswell ("Secret Service Agent Boswell" or "Boswell") and an unnamed agent who Werling identifies as "John Doe #1" ("Secret Service Agent John Doe #1" or "John Doe #1")—told Werling that "only people who have been formally invited by the Republican Party c[ould] attend Trump's rallies." ECF No. 8 at 4. Werling says that Boswell and John Doe #1's statement was a lie. *Id.*

Boswell and John Doe #1 left Werling briefly in his vehicle and then returned with another agent, Jermaine Johnson ("Secret Service Agent Johnson" or "Johnson"). *Id.* Boswell, John Doe #1, and Johnson questioned Werling—he does not say what about—and then left him again. *Id.*

The Secret Service Defendants assert that, after questioning Werling, they investigated the reasons for Werling's placement on a domestic terrorist watchlist. ECF No. 41 at 6 (answer). Secret Service Defendants contacted other federal agencies and also tried to "confirm whether [Werling's] travel to Dodge County violated the terms of his parole . . . ." *Id.* They state that their investigative efforts were prolonged because they

---

[4]Werling appears not to dispute that he was on the watchlist, though he questions the validity of the list and his inclusion on it. *See* ECF No. 50 at 4 (arguing that he was targeted "simply due to his presence on this watchlist" and that he had committed no offense that would have warranted his inclusion on it). The Secret Service Defendants also note that, as of the date of the rally, then-candidate Trump had recently been the victim of two assassination attempts. ECF No. 41 at 4.

were experiencing "difficulty [contacting] [Werling's] parole agent on a Sunday morning." *Id.* It is unclear how Defendants knew or believed that Werling was under some form of state supervision.

Werling disputes that he had a "parole agent" or that he was on any form of government supervision at the time of this incident. ECF No. 50 at 4–5 n.2; *id.* at 6 & n.4. However, state court records subject to judicial notice, *Vrana*, 638 F. Supp. 3d at 929 (citation omitted), appear to show that Werling was, in fact, under state pretrial supervision at this time. *See State of Wisconsin v. Nicholas Scott Werling*, Milwaukee Cnty. Cir. Ct. Case No. 2022CF002289, *available* *at* https://wcca.wicourts.gov/caseDetail.html?caseNo=2022CF002289&county No=40&index=0&mode=details (last visited Dec. 30, 2025) (hereinafter "Milwaukee County Case"). In the Milwaukee County Case, he was arrested in mid-June 2022 and held in custody until September 8, 2022, when the state court ordered that "[i]f . . . [c]ash [b]ail has been paid, [Werling was] to be released and placed on the Electronic Monitoring (GPS) waiting list." *Id.*, Sept. 8, 2022 docket entry. The state court further ordered that Werling be subject to "Level 5 Supervision" by JusticePoint.[5] *Id.*

Despite the bond order in the Milwaukee County Case, Werling remained in custody until mid-April 2024 pursuant to a separate state case. *See id.* at Nov. 11, 2022; Feb. 13, Feb. 20, May 2, May 30, July 21, Aug. 31, Oct. 4, Nov. 6, Dec. 7, 2023; Jan. 9, Jan. 22, Feb. 26, and April 8, 2024 docket entries; *State of Wisconsin v. Nicholas Scott Werling*, Rock Cnty. Cir. Ct. Case No. 2022CF000472, *available* *at*

---

[5]JusticePoint is a non-profit organization that contracts with the City of Milwaukee to provide, among other services, pretrial supervision of individuals in the criminal justice system. *See generally* JUSTICEPOINT, https://justicepoint.org/about [perma.cc/YAE6-FF2R] (last visited Nov. 20, 2025).

https://wcca.wicourts.gov/caseDetail.html?caseNo=2022CF000472&county
No=53&index=0&mode=details (last visited Dec. 30, 2025) (hereinafter
"Rock County Case"), Apr. 9, 2024 docket entry (sentencing hearing
minutes reflecting that Werling was sentenced with credit for time served
and no additional supervision); *id.*, Apr. 15, 2024 docket entry (changing
address from "Rock County Jail" to a Post Office box).

A few weeks after Werling was sentenced and released in the Rock
County Case, he posted bond in the Milwaukee County Case and
presumably was released from custody. *See* Rock County Case, Apr. 9, 2024
docket entry; Milwaukee County Case, May 3, 2024 ("Cash bond posted")
and June 10, 2024 ("Defendant's Motion for Bond Modification" sent from
Werling's Post Office box address) docket entries. Subsequent docket
entries in the Milwaukee County Case do not show him in custody. *See*
Milwaukee County Case, June 17, Aug. 28, Sept. 9, Nov. 12, and Dec. 13,
2024 docket entries. The Court presumes that, upon his release from pretrial
custody in the Milwaukee County Case, Werling was then subject to "Level
5 Supervision" as previously ordered. *Id.*, Sept. 8, 2022 docket entry. It
appears that Werling remained subject to this supervision as of October 6,
2024; there is no indication otherwise on the Milwaukee County Case
docket. *See generally id.* Thus, while Werling is correct that he was not on
"government supervision as a punishment for a crime" or a criminal
conviction, ECF No. 50 at 4 n.2 & 6 n.4, and therefore may not have had a
parole agent or post-sentencing supervising agent specifically, he
apparently *was* under state pretrial supervision at the time of the incident

he challenges in this case, and therefore may have had a state officer or agent supervising him.[6]

Returning to the facts in this case: at about 8:38 a.m., Werling asked Dodge County Sheriff's Deputy Dean and another deputy, Ryan Schwartz ("Dodge County Sheriff's Deputy Schwartz" or "Schwartz") to return his keys to him; they refused. ECF No. 8 at 4. Werling asked Dean and Schwartz if he was being detained; they responded that Werling was indeed "being detained by order of the Secret Service." *Id.* When Werling asked what legal authority existed for his detention, Dean and Schwartz "told [him] to 'take it up with Secret Service.'" *Id.* at 4–5. Werling stepped out of his vehicle and attempted to ask Secret Service agents this question, but Dean "became aggressive and demanded that [Werling] get back in his car." *Id.* at 5. Dean called John Doe #1 over to the vehicle to talk with Werling, but John Doe #1 did not do so. *Id.* During this time, Dodge County Sheriff's Deputy-in-Training Alex Kaufman ("Dodge County Sheriff's Deputy Kaufman" or "Kaufman") was standing nearby "in an intimidating manner to prevent [Werling] from leaving." *Id.*

At some point later, an unnamed law enforcement officer, Jane Doe #1, who Werling believes was an officer of an unidentified county sheriff's department, brought an explosive-sniffing dog to Werling's vehicle and conducted a sniff search. *Id.* He does not specify whether the dog sniffed only the exterior of his vehicle or any interior portion of it. Another unnamed law enforcement officer, John Doe #2, who Werling believes was another agent of the Secret Service, got on the ground and looked

---

[6]The Secret Service Defendants appear to contend that Werling was on supervision in the Rock County Case on October 6, 2024. ECF No. 43 at 17 n.6. However, for the reasons explained above, this appears inaccurate.

underneath Werling's vehicle. *Id.* Then at about 9:38 a.m., "shortly after the dog got done sniffing[,]" Dodge County Sheriff's Deputy Dean told Werling that he was free to go. *Id.* Altogether Werling was detained for slightly over two hours. *Id.*

Werling proceeds against Defendants on claims that

- He was seized without sufficient legal basis in violation of the Fourth Amendment;

- The two hour-plus stop was an unreasonably long seizure in violation of the Fourth Amendment; and

- The traffic stop was unreasonably prolonged to permit a dog sniff of his car in violation of the Fourth Amendment.

ECF No. 7 at 9–10; ECF No. 8 at 6–7; ECF No. 9 at 3 (noting that amended complaint "does not alter anything in the Court's analysis in its screening order").[7]

**4.      ANALYSIS**

The Secret Service Defendants assert they are entitled to judgment on the pleadings for two reasons: first, that Werling's claims are not one of the judicially created causes of action allowed under *Bivens*; and second, that they are entitled to qualified immunity. ECF No. 43. The Dodge County

---

[7]In his opposition brief, Werling also disputes the constitutionality of domestic terrorist watchlists and his inclusion on one. ECF No. 50 at 4 ("FBI watchlists shouldn't exist in the first place. . . . [Werling] received no notice of his placement on this list, and has no meaningful recourse to be taken off of it. [He] doesn't even know why he's on it. And yet he is . . . subject to violations of his due process rights as a result of being on the list."). However, he did not raise these claims in his operative complaint or seek leave to amend his complaint to raise such claims, so the Court will not consider them. *See Stocks v. Life Ins. Co. of N. Am.*, 861 F. Supp. 2d 948, 951 (E.D. Wis. 2012) ("Generally, pleadings may not [be] amended by a statement in a party's brief." (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011))).

Defendants join the Secret Service Defendants' motion as to the second argument. ECF No. 47. As stated in this section, the motion for judgment on the pleadings will be granted in both respects.

### 4.1 *Bivens* Claim

Over fifty years ago, the Supreme Court created a cause of action called a *Bivens* action. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971). The *Bivens* court held that an individual could sue a federal officer for constitutional violations because "'[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.'" *Id.* (quoting *Marbury v. Madison*, 5 U.S. 137, 163 (1803)). The original *Bivens* cause of action allowed an individual to seek damages from Federal Bureau of Narcotics Agents under the Fourth Amendment for conducting an unreasonable search of his home. *Id.* In the fifty-plus years since the creation of the original *Bivens* cause of action, the Supreme Court has only extended a *Bivens* cause of action against federal officers in two other scenarios, neither of which is implicated in this case. *See Davis v. Passman*, 442 U.S. 228 (1979) (extending *Bivens* to a claim that a Congressman discriminated against a staffer because of her sex in violation of the Fifth Amendment); *Carlson v. Green*, 446 U.S. 14 (1980) (extending *Bivens* to a claim alleging that prison officials violated a prisoner's Eighth Amendment rights by giving inadequate medical care). The Supreme Court has subsequently declined to recognize implied damages remedies in new contexts and "cautions against implying new causes of action." *Sargeant v. Barfield*, 87 F.4th 358, 363 (7th Cir. 2023).

A two-step framework is used to determine whether a plaintiff can bring a *Bivens* claim. First, a court must determine whether the claim is a

"new *Bivens* context." *Ziglar v. Abbasi*, 582 U.S. 120, 140 (2017). Whether a cause of action is considered a "new *Bivens* context" depends on if it differs in a meaningful way from previous *Bivens* cases decided by the Supreme Court. *Id.* Meaningful differences may include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the function of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 139–40. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in case in which a damages remedy was previously recognized." *Hernandez v. Mesa*, 589 U.S. 93, 103 (2020) (citing *Carlson*, 446 U.S. at 16–18, and *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71–74 (2001)). If the present case differs from prior cases in a meaningful way, the context is considered new. *Id.*

Once a claim is determined to be a new context, the second step in the inquiry asks whether "special factors counsel[] hesitation" against an implied cause of action. *Carlson*, 446 U.S. at 18. Central to the analysis of the special factors inquiry is whether "separation-of-powers principles" provide the Court with reason to believe that the judiciary is not best suited to determine if a cause of action is appropriate in the circumstances presented. *Ziglar*, 582 U.S. at 137 (collecting cases); *Egbert v. Boule*, 596 U.S. 482, 496 (2022); *Hernandez*, 589 U.S. at 102.

Plaintiff's claims in this case, and the various Fourth Amendment theories on which they are based, *see supra* Section 3, are an attempt to create a new cause of action in a new context, distinct from the context in which

*Bivens* arose. While Plaintiff's claim is under the same constitutional provision as *Bivens*, this is not a categorical reason to determine the context is the same as *Bivens*. *Hernandez*, 589 U.S. at 103. Importantly, the officers in *Bivens*—Federal Bureau of Narcotics agents—are a different "category of defendants" from the Secret Service agents involved in the present case, and each have distinct statutory mandates and duties. *Id.* at 94 (quoting *Correctional Services Corp.*, 534 U.S. at 68); *Ziglar*, 582 U.S. at 140. Federal Bureau of Narcotics agents are akin to modern day Drug Enforcement Administration (DEA) agents because they operate under the same legal mandate, "the enforcement of federal drug laws." *Snowden v. Henning*, 72 F.4th 237, 246 (7th Cir. 2023). DEA agents are primarily tasked with law enforcement duties such as executing and serving warrants, seizing property, and making arrests. *See* 21 U.S.C. § 878. In contrast, Secret Service agents' primary task—and the task that the Secret Service Defendants were performing in this case—is to protect national leaders including "[t]he President, . . . [f]ormer Presidents[,] . . . [and] [m]ajor Presidential . . . candidates." 18 U.S.C. § 3056(a)(1), (3), (7). These differences persuade the Court that the present circumstances constitute a new context for a potential *Bivens* claim.

The involvement of Secret Service agents also creates a meaningful difference in the "risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Ziglar*, 582 U.S. at 140. Again, the Secret Service is tasked with protecting high-level figures in the executive branch and reports to the Secretary of Homeland Security. 18 U.S.C. § 3056(a). Werling concedes that the Secret Service Defendants were tasked with protecting a rally for then-candidate Trump. *See* ECF No. 50 at 3 (citations omitted). If the Court were to create a *Bivens* cause of action here, it could

disrupt the protection of these officials by the Secret Service. This factor also underscores that the facts alleged in this case present a new *Bivens* context.

Because Plaintiff's claims present a new context distinct from the circumstances at issue in *Bivens*, the Court next considers whether special factors counsel hesitation in extending *Bivens* to this new context. Significantly, the regulation of, and potential imposition of civil remedies on, Secret Service agents implicates national security because, as discussed previously, these agents protect high-level political figures. 18 U.S.C. § 3056(a). When a person who is allegedly on a domestic terrorist watchlist is going to a political rally held by a presidential candidate—especially one who was recently the target of two assassination attempts—national security is clearly implicated. *See Robinson v. Pilgram*, No. 20-CV-2965 (GMH), 2021 WL 5987016, at *13–14 (D.D.C. Dec. 17, 2021), *aff'd*, No. 22-5001, 2022 WL 3009621 (D.C. Cir. July 28, 2022) (finding that national security interests are at stake in matters related to Secret Service protection of the President). Because issues of national security are better left to the other branches of the government, "a *Bivens* cause of action may not lie where, as here, national security is at issue." *Egbert*, 596 U.S. at 494 (citing *Haig v. Agee*, 453 U.S. 280, 292 (1981)). Although Congress has not created a distinct remedy for alleged constitutional violations arising in this context, this does not "compel [the Court] to step into [Congress's] shoes" to create such a remedy. *Hernandez*, 589 U.S. at 113.[8]

_____

[8]Plaintiff disputes whether the actions undertaken by the Secret Service Defendants in fact protected then-presidential candidate Donald Trump. ECF No. 50 at 4 ("[N]othing that [the] Secret Service Defendants did actually protected then-presidential candidate Trump."). However, there is no dispute that the Secret Service Defendants were tasked, under statute, with protecting the area for the rally being held by then-presidential candidate Donald Trump. 18 U.S.C. § 3056(a). And in any event, "the question here is 'not whether the national security risk

*Snowden v. Henning*, which Werling cites, ECF No. 50 at 8, is not to the contrary. In *Snowden*, the Seventh Circuit reversed a lower court's dismissal of a Fourth Amendment excessive force claim against a federal agent because the panel could "identify no meaningful difference between Snowden's case and *Bivens* to suggest that he should not be able to pursue" the claim. 72 F.4th at 245–46. The Seventh Circuit noted that the defendant federal agent "operated under the same legal mandate as the officers in *Bivens*—the enforcement of federal drug laws," was "the same kind of line-level federal narcotics officer as the defendant-officers in *Bivens*," and pursued a claim of excessive force during arrest, as Bivens had (in addition to an unreasonable search claim). *Id.* at 246; *Bivens*, 403 U.S. at 389. The court also noted that "allowing a *Bivens* claim" against the defendant federal officer did not "risk a disruptive intrusion into the functioning of other branches of government." *Snowden*, 72 F.4th at 246 (internal quotation marks omitted). Unlike in *Snowden*, meaningful differences exist between Werling's claim and the *Bivens* cause of action, as detailed above.

The Court finds that Werling's Fourth Amendment claims present a new context, and that a significant special factor counsels hesitation in extending *Bivens* to this new context. This conclusion holds true regardless of any dispute, meaningful or not, as to whether Werling was on a domestic terrorist watchlist, *see supra* note 4, or whether he was under state supervision at the time he was seized. Accordingly, the Secret Service

---

actually justified the particular action taken' against the plaintiff," but rather "whether national-security concerns were present in the decision-making process the federal official faced." *Robinson*, 2021 WL 5987016, at *14 (quoting *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 32 (D.D.C. 2021)) (some internal quotation marks omitted).

Defendants' motion for judgment on the pleadings will be granted, and Werling's *Bivens* claims are subject to dismissal on this basis.

### 4.2 Qualified Immunity

The Secret Service Defendants argue in the alternative that they are protected by qualified immunity from liability because Werling's complaint does not plead any plausible constitutional violation and the rights that he seeks to protect were not clearly established at the time of the incident. ECF No. 43 at 10–23. The Dodge County Defendants seek to join the motion for judgment on the pleadings on this basis. ECF No. 47. The Court will grant the Dodge County Defendants' motion and consider whether Defendants are protected by qualified immunity.

Qualified immunity is an affirmative defense that protects public officials from the civil consequences of their constitutional violations "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would known." *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978) and *Wood v. Strickland*, 420 U.S. 308, 322 (1975)). A court typically may not dismiss a complaint on a Rule 12 motion relying on an affirmative defense such as qualified immunity, but may do so if the complaint and matters subject to judicial notice clearly demonstrate that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McMath v. City of Gary, Ind.*, 976 F.2d 1026, 1031 (7th Cir. 1992) (quoting *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir. 1985)); *see also Ewell v. Toney*, 853 F.3d 911, 919–20 (7th Cir. 2017) (affirming a Rule 12(b)(6) dismissal on qualified immunity grounds).

In deciding whether qualified immunity is warranted, the Court determines "(1) whether the record evidences the violation of a federal statutory or constitutional right; and if so (2) whether the right violated was clearly established at the time the violation occurred." *Schimandle v. Dekalb Cnty. Sheriff's Office*, 114 F.4th 648, 655 (7th Cir. 2024) (collecting cases). Qualified immunity applies "if *either* inquiry is answered in the negative." *Gibbs v. Lomas*, 755 U.S. F.3d 529, 537 (7th Cir. 2014). The Court is "permitted to address the two prongs of qualified immunity in either order." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)); *see also Pearson*, 555 U.S. at 236 (noting that while "it is often beneficial" to address the qualified immunity prongs in order, doing so is "not . . . mandatory in all cases").

"Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013) (citing *Wheeler v. Lawson,* 539 F.3d 629, 639 (7th Cir. 2008)).

The Court addresses whether the complaint, answer, and matters subject to judicial notice establish that Werling's Fourth Amendment rights were violated under each of the three theories he raises.

### 4.2.1   Legal Basis for Seizure

Defendants argue that Werling's seizure comported with the Fourth Amendment's reasonableness requirement under the special needs exception, and accordingly, they are protected by qualified immunity. ECF No. 43 at 12–16; ECF No. 51 at 6–9; *see also* ECF No. 41 at 9 (Secret Service Defendants' answer, conceding that "they did not have reasonable

suspicion or probable cause to believe that [Werling] had committed a crime but deny[ing] that reasonable suspicion or probable cause was necessary for law enforcement to detain [Werling] lawfully under the circumstances presented").

The special needs exception "applies when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *United States v. Caya*, 956 F.3d 498, 502 (7th Cir. 2020) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); *see also Shelton v. Gudmanson*, 934 F. Supp. 1048, 1050 (W.D. Wis. 1996) (noting that the special needs exception dispenses with the usual requirement that searches and seizures be "based on individual suspicion" (citing *Griffin*, 483 U.S. at 873)). "To determine the reasonableness of a search under the Fourth Amendment, we look at the totality of the circumstances, balancing the degree to which the search intrudes on individual liberty and the degree to which it promotes legitimate governmental interests." *United States v. White*, 781 F.3d 858, 862 (7th Cir. 2015) (citing *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999) and *Narducci v. Moore*, 572 F.3d 313, 319 (7th Cir. 2009)).

Defendants frame "the governmental interest at issue" in this case as "protecting the health and safety of a presidential candidate and the thousands of members of the public gathering to hear him speak." ECF No. 43 at 12. Accordingly, they argue that neither probable cause nor reasonable suspicion was required to seize Werling because "[p]rotecting former presidents and high-profile candidates for government office is one such 'special need'" exempt from the typical requirement of a warrant or individualized suspicion (either reasonable suspicion or probable cause). *Id.* at 13–14 (citing *Berg v. Kelly*, 897 F.3d 99, 108 (2d Cir. 2018) and *Kinsella*

Case 2:24-cv-01291-JPS     Filed 12/30/25     Page 17 of 31     Document 55

*v. Incorporated Village of East Hampton*, No. 15CV3948GRBSIL, 2021 WL 11633992, at \*9 (E.D.N.Y. Dec. 6, 2021)).

Special needs are those "divorced from the [s]tate's general interest in law enforcement." *Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001) (footnote omitted). If "the purpose actually served" by the seizure "is ultimately indistinguishable from the general interest in crime control," no special need exists, and the Fourth Amendment's typical warrant or individualized suspicion requirement applies. *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)); *see also Kinsella*, 2021 WL 11633992, at \*9 ("To trigger this exception, a search or seizure 'must serve as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation.'" (quoting *MacWade v. Kelly*, 460 F.3d 260, 268 (2d Cir. 2006) (internal quotation marks omitted)); *MacWade*, 460 F.3d at 271 (noting that special needs are present where the government is trying to "prevent and discover latent or hidden hazards" in a manner "distinct from ordinary post hoc criminal investigations" (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 668 (1989) (internal quotation marks and ellipsis omitted)) (string citation omitted)).

The Court agrees that protection of presidential candidates is a special need justifying a seizure without a warrant or individualized suspicion. Here, Defendants were not merely trying to enforce criminal laws or gather evidence related to crime. Their charge was prevention of threats on a presidential candidate's (and former president's) life and, potentially, accompanying threats to the many members of the public gathered in close quarters to see him. True, any attempt on a presidential candidate's life would have been a crime, and attempts to otherwise disrupt the rally similarly could have been prosecuted, but the fact that Defendants

were guarding against behavior that might have been prosecuted or subject to criminal penalties does not transform their duties on October 6, 2024 into "ordinary evidence gathering" or a standard "post hoc criminal investigation." *MacWade*, 460 F.3d at 268, 271 (citations omitted).

Rather, as the Supreme Court has recognized in various contexts, law enforcement officers like Defendants have a heightened mandate when protecting the President of the United States, and by extension, former presidents and major presidential candidates. *See Watts v. United States*, 394 U.S. 705, 707 (1969) ("The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats." (citation omitted)); *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (noting that the principle of qualified immunity—that "'officials should not err always on the side of caution' because they fear being sued"—is "nowhere more important than when the specter of Presidential assassination is raised" (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984))); *Wood v. Moss*, 572 U.S. 744, 763–64, (2014) (actions of secret service agents were objectively reasonable in light of a valid security concern that protesters were within "weapons range" of the President); *Kinsella*, 2021 WL 11633992, at *9 ("Defendants have established that law enforcement's seizure of Plaintiffs was not only intended to protect Romney, a presidential candidate, but fell squarely within the ambit of the Fourth Amendment's 'special needs' exception.").

Werling correctly notes that "neither the U.S. Supreme Court nor the Seventh Circuit" has applied the special needs exception to "allow[] . . . Secret Service agents and their minions to detain anyone they want, as long as they are in somewhat close proximity to a presidential candidate's rally

and they are on [an FBI watchlist]." ECF No. 50 at 9. But in a different part of his brief, he "readily admits that protection of the president is a special need apart from routine law enforcement." *Id.* at 3 (citing *Berg*, 897 F.3d at 108, and *Kinsella*, 2021 WL 11633992). He also admits that he was included on a domestic terrorism watchlist (although he disputes the validity of such a list, *see supra* note 7), i.e., that he was indicated as potentially posing the kind of threat that Defendants were tasked with addressing. Even without Werling's concessions, considering the absence of binding authority to the contrary, persuasive out-of-circuit precedent such as *Berg* and *Kinsella*, the Supreme Court's statements in other contexts about law enforcement protection of the President, and a common sense reading of the facts alleged, the Court is persuaded to adopt Defendants' position.

Having concluded that Defendants have established a special need, the Court next "balanc[es] the degree to which the search intrudes on individual liberty and the degree to which it promotes legitimate governmental interests." *White*, 781 F.3d at 862 (citations omitted). Defendants contend that their "intrusion on [Werling's] liberty was relatively minimal" because they did not search his person or his vehicle and Werling has not alleged that the questions Defendants asked him were "abnormally intrusive or inappropriate in nature." ECF No. 43 at 15. Werling does not really respond to these arguments (his arguments that the seizure was excessively long are addressed *infra* Section 4.2.2). Based on the allegations in the complaint, and what is not alleged in the complaint, the Court agrees with Defendants that any intrusion on Werling's liberty was minimal.

Werling appears to question whether the seizure served legitimate governmental interests by arguing that Defendants' actions did not

"actually protect[]" then-candidate Trump. ECF No. 50 at 4. However, the Court agrees with Defendants that "second-guessing regarding the need or effectiveness of Defendants' actions is not enough to make them 'unreasonable' for purposes of the Fourth Amendment." ECF No. 51 at 8 (citing *Berg*, 897 F.3d at 104 ("With the benefit of hindsight, other means might be imagined to safeguard the President while also allowing plaintiffs to protest with less restriction on their freedom of movement. But the officers were balancing a number of legitimate concerns . . . in a dynamic situation.")). At the time that they detained Werling, Defendants knew of his inclusion on a domestic terrorism watchlist; that Defendants ultimately decided not to prevent Werling from going on his way is simply not relevant to the analysis of what happened at the time of the seizure. *See Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("[R]easonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' . . . ." (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989))).

For all these reasons, the Court finds that this seizure falls within the special needs exception to the Fourth Amendment's warrant or individualized suspicion requirement, and that any intrusion on Werling's liberty was minimal and did not outweigh the government's interest in protecting then-candidate Trump. Werling's allegations therefore do not plausibly allege a seizure without a sufficient legal basis in violation of the Fourth Amendment. Accordingly, this claim is subject to dismissal, either on the basis of qualified immunity or failure to state a claim.[9]

---

[9]Defendants argue that this and Werling's other alleged constitutional violations were not clearly established by existing precedent and that qualified immunity applies for this reason as well. ECF No. 43 at 20–23. However, Defendants have cited only to authority examining qualified immunity in the

#### 4.2.2   Length of Seizure

Defendants next argue that the length of Werling's detention was not constitutionally unreasonable. ECF No. 43 at 16–17.

"There is no bright-line rule as to how long an investigative detention may last; instead [the Court] look[s] to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions." *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (citing *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985) and *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)). "Detentions beyond an hour may well 'approach the outer boundaries of permissible *Terry* stops,' . . . but are not per se unreasonable . . . ." *Kampinen v. Martinez*, 102 F. App'x 492 (7th Cir. 2004) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) and collecting cases). "[L]ength alone does not decide the issue"; instead, the Court "look[s] to the totality of the circumstances to determine whether the stop was reasonable." *Id.* (citing *United States v. Owens*, 167 F.3d 739, 749 (1st Cir. 1999), *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003), and *United States v. McCarthy*, 77 F.3d 522, 531 (1st Cir. 1996)).

Defendants state that, during the two hours in which Werling was detained, they investigated his inclusion on a domestic terrorism watchlist "by contacting representatives of other federal agencies" and attempted to confirm whether Werling's travel violated the terms of his supervision by

───────────────

context of a Fourth Amendment claim for detention beyond a reasonable length of time. *Id.* at 22 (citing *Kampinen v. Martinez*, 102 F. App'x 492 (7th Cir. 2004)). The case they cite does not discuss the special needs exception at all. *See generally Kampinen*, 102 F. App'x 492. Because Defendants have not developed their "not clearly established" argument with respect to Werling's specific claim that his seizure lacked a sufficient legal basis, the Court does not address this argument here.

contacting his parole or supervising agent, an effort that was slowed down because it was difficult to reach the agent on a Sunday morning. ECF No. 43 at 16–17; ECF No. 41 at 6. They note that Werling's operative complaint does not "allege that . . . [D]efendants deviated from their initial purpose in detaining him, namely, investigating whether he posed an immediate security threat to those attending the nearby political rally." ECF No. 43 at 17.

Werling speculates that "conduct[ing] the two investigatory tasks" of contacting federal agencies regarding his inclusion on a watchlist and contacting Werling's supervising agent "would take reasonable law enforcement officers fifteen minutes at the most." ECF No. 50 at 7.

It is not possible to determine whether the length of Werling's detention was reasonable based only on the allegations in the pleadings. On one hand, Defendants have not accounted for why their contacts to other federal agencies and to Werling's supervising agent took two hours (or, perhaps, what other crowd control and safety duties Defendants had to juggle while at the same time looking into Werling's background, lengthening what normally would have been a swift process). They have not explained what, if anything, they found out from these contacts—did "the information [they] gathered only fuel[]" further investigation, *Kampinen*, 102 F. App'x at 496, or did it immediately resolve their concerns about Werling? On the other hand, Werling's assertion that these tasks should have taken a fraction of the time that they did is self-serving and based on nothing in the record. As just noted, perhaps these tasks might take fifteen minutes in a vacuum, but would likely take longer if Defendants were attending to other safety matters and investigating other individuals at the same time, and almost certainly would require additional time and

follow-up if the contacts revealed additional information about Werling that aroused suspicion.[10] "The reasonableness of a seizure . . . depends on what the police in fact do," and at this stage, the Court cannot resolve disputes of fact or rely on speculation to know what Defendants in fact did. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015) (citing *Knowles v. Iowa*, 525 U.S. 113, 115–17 (1998)).

However, irrespective of whether Werling could eventually prove that his detention was unreasonably long, it was not clearly established on October 6, 2024 that detaining an individual who was on a domestic terrorism watchlist for two hours outside of a major presidential candidate's political rally while investigating his inclusion on such a watchlist and his possible violation of state supervision was an unreasonable detention in violation of the Fourth Amendment. Werling "need not point to an identical case finding the alleged violation unlawful, 'but existing precedent must have placed the . . . constitutional question beyond debate.'" *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Werling points to *Rodriguez v. United States* as clearly establishing his relevant Fourth Amendment right here, ECF No. 50 at 5–6 (citing 575 U.S. at 354), but that case establishes that "a police [traffic] stop exceeding the time needed to handle the matter for which the stop was made" and prolonged only to permit a dog sniff of the plaintiff's vehicle "violates the

---

[10]As explained at length *supra* Section 3, Werling appears to have been under some form of state supervision on October 6, 2024, although he denies being under supervision or parole for a criminal conviction. But the existence of a possible dispute of fact as to whether Werling was indeed under state supervision, and accordingly whether he had a state supervising agent for Defendants to contact, is another reason to defer finding the length of Werling's detention reasonable or unreasonable.

[Fourth Amendment's] shield against unreasonable seizures." 575 U.S. at 350; *id.* at 355–56 ("[T]he Government acknowledged at oral argument that a dog sniff . . . is not an ordinary incident of a traffic stop. . . . Lacking the same close connection to roadway safety . . . , a dog sniff is not fairly characterized as part of the officer's traffic mission."). While relevant to Werling's claim that Defendants unreasonably prolonged his seizure to permit a dog to sniff his vehicle—and discussed *infra* Section 4.2.3— *Rodriguez* does not shed light on whether it was clearly established that Werling's seizure and detention was per se unreasonably long, which is how this Court must construe this particular claim since Werling has raised it separately from his dog-sniff claim and contends that it is "patently unreasonable" that he was detained for two hours. ECF No. 50 at 6. Besides *Rodriguez*, Werling has not pointed to any other precedent clearly establishing his right to be free from a seizure he contends was per se unreasonably long under these circumstances, and the Court has not located any. *See Abbott*, 705 F.3d at 723–24 (requiring a "closely analogous case") (citation omitted). Werling does not argue, and the Court does not find, that the length of his detention was "so egregious and unreasonable" that it would have been obvious to Defendants that they were acting unlawfully. *Id.* at 724 (citation omitted).

To the contrary, *Kampinen v. Martinez* suggests that similar defendants' actions in a similar scenario are constitutionally reasonable or at least protected by qualified immunity. The plaintiff in that case—who had "previously been arrested . . . for criminal trespass" and who had previously been investigated for making "several harassing telephone calls . . . to members of Donald Trump's 'organization'"—entered a restricted area near where then-President Bill Clinton was set to speak, and was

intercepted and detained by Secret Service agents. 102 F. App'x at 493. The agents held her for several hours, at least seventy minutes of which was not consensual. *Id.* at 495–96 (noting that the record at summary judgment "[left] much to guesswork about the point where her encounter with the defendants became compulsory rather than consensual"). The Seventh Circuit held that her "continuing detention," during which the agents "diligently investigated her background," "was reasonable because the purpose of the stop—protecting the President from any potential threat—justifies greater intrusion into an individual's Fourth Amendment rights than would other circumstances." *Id.* at 496 (collecting cases). Similarly, out-of-circuit precedent from 2018 finds both that the two-hour detention of protesters present near a fundraising event for then-President Barack Obama was reasonable and that there was an "absence of clearly established law prohibiting" such detentions. *Berg*, 897 F.3d at 103–04, 111–13.

Alternatively, if *Kampinen* cannot be read as definitively establishing the length of Werling's detention in this case as reasonable—the Seventh Circuit elected not to publish *Kampinen* as precedential—this further supports that qualified immunity should apply, because no other binding precedent of which the Court is aware establishes that a seizure analogous to Werling's is unreasonable. In other words, even if *Kampinen* establishes only that the reasonableness of a two-hour detention in these circumstances is an open question in this Circuit, this, too demonstrates that the question is not "beyond debate," *Kemp*, 877 F.3d at 351 (citation omitted), which supports application of the qualified immunity doctrine.

For all these reasons, Werling's Fourth Amendment claim that his detention exceeded a constitutionally reasonable length is subject to dismissal on the basis of qualified immunity.

### 4.2.3   Prolongation of Seizure to Permit Dog Sniff

Finally, with respect to Werling's claim that his detention was unreasonably prolonged to permit a dog sniff of his car, in violation of the Fourth Amendment, Defendants argue that they did not "extend a routine traffic stop to look for unrelated crimes, as was the case in *Rodriguez*," but rather that "the explosive dog sniff . . . was done specifically to serve [their] original 'mission' in detaining [Werling]: ensuring that [he] was not going to commit a terroristic act at a political rally." ECF No. 43 at 19–20.

"[A]n officer may not prolong an otherwise-lawful traffic stop in order to conduct a dog sniff." *United States v. Johnson*, 93 F.4th 383, 387 (7th Cir. 2024) (emphasis omitted). "[T]he permissible duration of a traffic stop is determined by the 'mission' of the stop." *Id.* (citing *Rodriguez*, 575 U.S. at 356). "If an officer prolongs a stop beyond its permissible length to conduct a dog sniff, even for a short time, the stop becomes unlawful unless the officer has reasonable suspicion of criminal activity." *Id.* (citing same at 356–57).

As explained *supra* Section 4.2.1, Werling's seizure was supported by a sufficient legal basis. Crediting Defendants' allegations in their answer, as the Court must on a motion for judgment on the pleadings, the seizure's mission at its inception was to determine "whether [Werling] posed an immediate security threat to those attending the nearby political rally." ECF No. 43 at 17; *id.* at 19 (describing the mission of the stop as "ensuring that [Werling] did not intend to engage in any acts of terrorism"); *see also* ECF No. 41 at 10 ("The Secret Service Defendants assert that they had reasonable

grounds to investigate [Werling's] background before allowing him to proceed closer toward a crowded rally for a presidential candidate given (among other things) [his] presence on a domestic terrorism watchlist maintained by the [FBI].").

Viewing the mission of the detention this way, Werling's continued detention to permit a dog to sniff his vehicle for explosives is constitutionally reasonable. The mission was to detect threats to Trump and rally attendees; this mission included investigating Werling's inclusion on the watchlist and his possible state supervision status, as well as investigating whether his vehicle contained any explosive material.[11]

*Rodriguez* does not help Werling in this case. There, the Supreme Court found that a dog sniff for drugs was unrelated to the traffic stop's original mission of investigating the defendant-driver's traffic infraction of swerving onto the highway shoulder. 575 U.S. at 351. Therefore, the dog sniff, which occurred after the investigating officer issued a written warning to the defendant-driver, was unreasonable under the Fourth

---

[11]The Court parenthetically references a different district court case in which Werling challenged his civil commitment by a Wisconsin state court. *Werling v. Hefty*, Case No. 24-CV-641, ECF No. 37 (W.D. Wis. Aug. 15, 2025). According to documents referenced in Werling's complaint in that matter, his civil commitment was based on, among other things: posting an Instagram photo related to target practice at a shooting range and comparing his shooting accuracy to that of Adam Lanza, the perpetrator of the 2012 Sandy Hook school shooting; a referral to police for "terroristic threats made toward school district officials"; the FBI's interception of "a letter sent by Werling to the perpetrator of 2019 mass shootings in Christchurch, New Zealand"; and a search of Werling's home, authorized by a warrant, in which law enforcement uncovered gun parts. *Id.* at 2. If these same facts were the reason for Werling's inclusion on the domestic terrorism watchlist, and Defendants found out this information during their investigation on October 6, 2024, then it is obvious why Defendants would feel the need to take all available measures to ensure that Werling posed no threat to Trump or rally attendees before permitting him to proceed toward the rally.

Amendment. *Id.* at 352, 355–58. Unlike *Rodriguez*, in this case, the dog sniff for explosives was part of the investigation to determine whether to permit Werling to proceed closer to the rally. Defendants did not deviate from their mission in conducting the dog sniff; rather, they furthered that mission.

For all these reasons, the Court cannot conclude that Werling's stop was unreasonably prolonged for the purpose of allowing a dog to sniff his vehicle for explosives. Accordingly, this Fourth Amendment claim is subject to dismissal on the basis of either failure to state a claim or qualified immunity.

### 4.3    Additional Matters

Because Werling has not alleged that the various Doe Defendants violated his constitutional rights in some manner different than the named Defendants did, any remaining claim against the Doe Defendants is subject to dismissal for failure to state a claim for the same reasons explained above. It is unnecessary to permit Werling to conduct discovery to determine the Doe Defendants' identities where he could not proceed against them in any event.

To the extent Werling intends to sue any Secret Service Defendant in his official capacity as a federal officer, *see* ECF No. 8 at 6, sovereign immunity would prevent him from doing so. *Morgan v. Fed. Bureau of Prisons*, 129 F.4th 1043, 1049 (7th Cir. 2025) ("[F]ederal sovereign immunity bars suits against the United States, including suits against federal agencies or federal officials in their official capacities, unless Congress has waived this immunity." (citing *United States v. Testan*, 424 U.S. 392, 399 (1976))). Any official capacity claim against any Dodge County Defendant also fails because "[a] suit against a public employee in his official capacity is equivalent to a suit against the government entity," and a plaintiff

proceeding against a municipal defendant must allege and prove a "municipal policy [or practice] that caused the alleged violation of his constitutional rights." *Cano v. Vasquez*, No. 2:16CV401, 2016 WL 7475658, at *2 (N.D. Ind. Dec. 29, 2016) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) and referencing *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1977)). Werling explicitly abandoned any *Monell* claim in this case. ECF No. 8 at 6.

**5.     CONCLUSION**

For all these reasons, the Secret Service Defendants' motion for judgment on the pleadings, in which the Dodge County Defendants join, will be granted in full. All of Werling's claims are subject to dismissal, and this case will be dismissed with prejudice.

Accordingly,

**IT IS ORDERED** that Defendants Agent Boswell and Jermaine Johnson's motion for judgment on the pleadings, ECF No. 42, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants Andrew Dean, Alex Kaufman, and Ryan Schwartz's motion to join the motion for judgment on the pleadings, ECF No. 47, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of December, 2025.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. *See* FED. R. APP. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* FED. R. APP. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* FED. R. CIV. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id*. A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.